# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**DANNY K. JONES**
    **Petitioner-defendant,**

  **v.**                                   **Case No. 18-C-0630**
                                        **(Criminal Case No. 14-CR-196)**

**UNITED STATES OF AMERICA,**
    **Respondent-plaintiff.**

## DECISION AND ORDER

Petitioner Danny Jones pleaded guilty to credit card fraud and identity theft charges, and Judge Clevert sentenced him to 70 months in prison. Petitioner now moves pursuant to 28 U.S.C. § 2255 to vacate his convictions and sentence, arguing that his trial counsel provided ineffective assistance by failing to adequately advise him during the plea process, failing to notice a possible defect in the indictment, failing to present mitigation arguments at sentencing, and failing to challenge sentencing guideline enhancements for loss amount and role in the offense.

On review of the government's answer, the transcripts of the prior proceedings, and the entire record, I conclude that petitioner is not entitled to relief on these claims. I accordingly deny the motion without a hearing and dismiss this action.[1]

---

[1] Petitioner does not specifically request an evidentiary hearing, and I conclude that no such hearing is necessary as the motion and the files and records of the case conclusively show that he is entitled to no relief. See Almonacid v. United States, 476 F.3d 518, 521 (7th Cir. 2007).

## I. BACKGROUND

On October 21, 2014, the government obtained an indictment charging petitioner and others with access device fraud. The government alleged that a co-defendant, Ashley Dover, obtained stolen credit card information, which she distributed to others, including petitioner, who used the information to purchase tickets to sporting and entertainment events, which were then resold outside event venues. The indictment specifically charged petitioner with conspiracy to traffic in, possess, and effect transactions with access devices issued to other persons (count 1) and six counts of using a means of identification of another person (counts 9-14). A magistrate judge allowed petitioner's release on conditions, including that he not sell tickets illegally. (R. 65.)[2]

Petitioner retained counsel, but that lawyer was permitted to withdraw on June 22, 2015, and the court appointed Attorney Kent Carlson. (R. 97, 99.) On August 26, 2015, the magistrate judge modified petitioner's bond conditions to add location monitoring and a no contact order after petitioner allegedly battered a co-defendant's brother in order to send a message to that co-defendant not to cooperate with the government. (R. 116.) On September 11, 2015, the government petitioned for an order revoking bond and ordering detention based on information that petitioner had continued to use stolen credit card numbers to purchase tickets while on pre-trial release. (R. 122.) Petitioner did not contest the allegations, and on September 21, 2015, the magistrate judge ordered detention. (R. 126, 127.)

On December 2, 2015, pursuant to an agreement with the government (R. 134), petitioner entered guilty pleas to counts 1 and 9, with the other counts to be dismissed at the

---

[2]Unless otherwise indicated, record citations are to the underlying criminal case, No. 14-CR-196.

2

time of sentencing. (R. 144.) Judge Clevert conducted an exhaustive plea colloquy, during which petitioner indicated that he and Attorney Carlson had "a great relationship" (R. 371 at 6:22); that Carlson had "explained everything" (R. 371 at 7:9); and that Carlson had given him "good advice" (R. 371 at 7:14-15). Judge Clevert asked Carlson to outline the topics he had discussed with petitioner (R. 371 at 7-8), and Carlson explained that he and petitioner had listened to many of the recorded conversations provided by the government and talked about how those conversation fit into the government's theory of the case, as well as the elements the government had to prove (R. 371 at 8:12-17.) They also discussed the obtaining of credit card numbers that were used in this case and how they were used in connection with ordering the tickets that were involved in this case. (R. 371 at 8:18-21.) They further discussed – at length – what a trial would look like and the possible defenses they might be able to raise, as well as the problems they would have given the recorded conversations and petitioner's use of the telephone and internet. (R. 371 at 8-9.) They ultimately determined that trial was something thing they should avoid. (R. 371 at 9:2-3.) They therefore entered into negotiations with the government, discussing the rights petitioner would be giving up, what the sentencing process was like, and the matters they would be able to raise at sentencing. (R. 371 at 9:3-7.) Petitioner confirmed that he had these discussions with Carlson. (R. 371 at 9:9-11.) Petitioner also confirmed that he discussed with Carlson what the government was offering and the sentencing guidelines that applied to those offers. (R. 371 at 10:13-16.) Judge Clevert asked petitioner, "Do you feel your lawyer has forced you to do something against your will?" Petitioner responded, "No, sir." (R. 371 at 35:23-25.)

During the colloquy, petitioner admitted that the government could prove the facts proffered at the hearing and set forth in the plea agreement. (R. 371 at 26-27.) As is pertinent

3

to the claims he raises in the instant motion, petitioner conceded that he directed others as to which venues to go to pick up and sell tickets. (R. 371 at 26:13-14.) In describing the offense in his own words, petitioner stated: "I would purchase the credit card numbers from Mrs. Dover to order tickets to like concerts, sporting events; and I would give them to individuals that I know to go out and work the events for me." (R. 371 at 27:14-17.) He explained that "work the events" meant "go out there are sell tickets that I purchased with stolen credit cards. They go out there and sell the tickets." (R. 371 at 27:20-22.) Petitioner took half of the proceeds after his workers sold the tickets. (R. 371 at 28:2-4.) Regarding the amount of loss caused by the scheme, the factual basis section of the plea agreement indicated that Dover distributed 3856 credit card account numbers, and the financial institutions associated with those numbers reported fraud on them in the amount of $1,778,436. (R. 134 Ex. B at 2.) Nevertheless, the government agreed to recommend a loss amount of over $550,000 (but less than $1,500,000) under U.S.S.G. § 2B1.1(b)(1) in determining petitioner's guideline range. (R. 134 at 5 ¶ 17.) Judge Clevert set the case for sentencing on March 22, 2016. (R. 144.)

Petitioner subsequently filed a motion for bail review, but on December 17, 2015, Judge Clevert maintained the detention order. (R. 154.) On March 8, 2016, on the joint request of the parties, Judge Clevert reset the sentencing hearing to July 27, 2016. On March 11, 2016, Attorney Carlson filed a motion to withdraw, reporting a breakdown in the relationship. (R. 179.) Judge Clevert held a hearing on March 21, 2016, at which petitioner and Carlson conferred with a representative of the federal defender's office, and after which Carlson advised the court that he and petitioner had resolved their issues. (R. 372 at 6.) Petitioner apologized to Carlson and to the court, indicating that he got frustrated by the delay in resolving his case. (R. 372 at 6-7.)

4

Judge Clevert subsequently moved the sentencing hearing up to June 15, 2016, and prior to that hearing Carlson submitted a 9-page sentencing memorandum with 17 pages of attachments. (R. 221.) The government also filed a U.S.S.G. § 5K1.1 motion based on petitioner's cooperation. (R. 226.)

At the sentencing hearing, petitioner confirmed that he and Carlson had reviewed and discussed the pre-sentence report ("PSR"), and that he had no additional matters he needed to bring to his lawyer's attention or discuss with his lawyer before proceeding with sentencing. (R. 267 at 2:13-21.) Carlson indicated that "we agree with the facts in the guidelines contained in the amended presentence investigation report." (R. 267 at 3:16-18.)

Regarding loss, the PSR indicated that law enforcement collected fraudulent transaction documents from 2009 through at least July 2012, which reflected 785 transactions producing losses of $705,850.64, with attempted losses of $77,171.84. The report further indicated that petitioner acted as an organizer or leader, as he coordinated the members of the organization, placed most of the ticket orders, and directed the picking up and selling of the tickets. (R. 223 ¶ 100.) The PSR accordingly recommended a 14-level enhancement for loss, U.S.S.G. § 2B1.1(b)(1)(H), and a 4-level enhancement for role in the offense, U.S.S.G. § 3B1.1(a). (R. 223 ¶¶ 135, 138.)

Judge Clevert adopted the guideline calculations in the report: total offense level 25, criminal history category II, and imprisonment range 63-78 months on count 1. Count 9 carried a mandatory 2-year consecutive sentence by statute. (R. 247 at 1.) Judge Clevert granted the government's U.S.S.G. § 5K1.1 motion, awarding a 25% reduction on count 1, which produced an adjusted guideline range of 37-46 months on that count. (R. 245; 267 at 3.)

The government recommended a sentence of 63 months, near the bottom of the

guideline range after departure (37-46 + 24 = 61-70). (R. 267 at 4:23-25; R. 226 at 2-3.) The government discussed the harm associated with credit card fraud, which caused financial losses and violated people's identities. (R. 267 at 5.) The government further noted that while the parties agreed to a loss in excess of $550,000, that was a conservative estimate, based on a spreadsheet listing fraudulent orders from 2009 to the middle of 2012, thus omitting losses related to a scheme that continued to October 2014 and beyond. (R. 267 at 5-6.) With regard to petitioner's role, the government indicated "there's no dispute he was a leader," who obtained credit card numbers, made orders for tickets, and directed others where to go to sell these tickets. (R. 267 at 6:12-22.) Finally, the government noted petitioner's brazen post-indictment conduct, including the alleged assault he committed as a warning not to cooperate and his continued fraudulent purchase of tickets. (R. 267 at 8-10.)

In his argument, Carlson focused on petitioner's conduct after he was taken into custody. Carlson stated that the detention had a significant impact, producing a change in petitioner's attitude. (R. 267 at 14.) Carlson further noted that, at the plea hearing, Judge Clevert had encouraged petitioner to make good use of his time and further his education, and petitioner had done so, reading a number of books and nearly completing his GED. (R. 267 at 14-15, 17.) Carlson stated that petitioner's combative attitude was gone, and he now realized he had no one to blame but himself. (R. 267 at 15.) Finally, Carlson noted that petitioner had plans for the future and wanted to pay restitution. (R. 267 at 17.) Carlson suggested a sentence of 40-48 months. (R. 267 at 18.)

Judge Clevert noted that while petitioner appeared to have learned some good lessons and broadened his horizons by reading, he had still ignored the orders of the court by engaging in additional criminal activity. Because of that, he rejected the recommendations from both

6

sides. He explained: "I take very seriously instances where defendants ignore orders of the Court. You can't come in here and expect minimal treatment when after being charged and after being ordered by the Court to change your behavior you go out and you commit additional crimes identical to what has been charged." (R. 267 at 24:12-17.) He imposed a total sentence of 70 months, 46 months on count 1 followed by 24 months consecutive on count 9. (R. 267 at 24.) He further ordered petitioner to serve a supervised release term of three years and pay restitution in the amount of $219,022.52. (R. 267 at 24-25.)

Petitioner filed a notice of appeal, but the Seventh Circuit dismissed his direct appeal as frivolous. The court of appeals noted that petitioner had not expressed a desire to challenge his guilty pleas and found that any challenge to the sentence would be frivolous. (R. 336.)

On April 19, 2018, petitioner filed the instant action under § 2255. The case was assigned to me due to Judge Clevert's retirement, and I ordered the government to respond and permitted petitioner to reply. Petitioner also filed a motion for bond pending a ruling on his § 2255 motion, to which the government has also responded.

## II. DISCUSSION

**A.     Legal Standards**

Section 2255 allows a federal prisoner to challenge his sentence on "the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). Relief under § 2255 "is an extraordinary remedy because it asks the district court essentially to reopen the criminal process to a person who already has had an opportunity for

7

full process." Almonacid, 476 F.3d at 521.

Here, petitioner alleges a violation of his Sixth Amendment right to the effective assistance of counsel, a claim which may be raised for the first time in an action under § 2255. See Massaro v. United States, 538 U.S. 500, 504 (2003). However, petitioner "bears a heavy burden to establish" such a claim, "as counsel is presumed effective." Menzer v. United States, 200 F.3d 1000, 1003 (7th Cir. 2000). He must show (1) that his attorney's performance was objectively deficient and (2) that the deficient representation caused him prejudice. Hicks v. United States, 886 F.3d 648, 650 (7th Cir. 2018) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)).

The court's review of a lawyer's performance is highly deferential, reflecting a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. Yu Tian Li v. United States, 648 F.3d 524, 527-28 (7th Cir. 2011). Petitioner must come forward with specific acts or omissions of his counsel that constitute ineffective assistance under prevailing norms. Hutchings v. United States, 618 F.3d 693, 697 (7th Cir. 2010). To establish prejudice, petitioner must show a reasonable probability that the outcome of the process would have been different with competent representation. Delatorre v. United States, 847 F.3d 837, 846 (7th Cir. 2017). "A reasonable probability is a probability sufficient to undermine confidence in the out-come." Strickland, 466 U.S. at 694.

**B. Analysis**

    **1. Carlson's Advice**

Petitioner claims that his relationship with Carlson was strained from the outset, for reasons unclear, and that Carlson did not represent him to the best of his ability, offering little

8

or no tactical support during the various phases of the case.  He further contends that after he was taken into custody Carlson offered little counsel or advice.  He notes that their relationship became so damaged that Carlson moved to withdraw; despite assuring the court at the hearing on that motion that their issues were resolved, petitioner contends that Carlson was only going through the motions and wanted the case over as quickly as possible.  He claims that Carlson was convinced of his guilt and rather than subject the government's case to meaningful scrutiny, he "directed" petitioner to enter a plea of guilty without giving him the opportunity to know, understand, and accept his guilty plea.  Petitioner states that nothing in the record indicates Carlson examined or reviewed the discovery, Carlson never provided petitioner with a recap of those materials, and Carlson never sought to investigate any flaws in the materials to contest the government's charges.  Rather, his analysis led him to advise petitioner that the government had him "dead to rights" and it would be best to plead guilty lest an unfavorable verdict at trial result in a greater sentence.  (Mem. in Support of Motion to Vacate [Case No. 18-C-630, R. 2] at 7-9.)

Petitioner does not explain how the result of the proceeding would have been different had Carlson spent more time with him.  He does not claim, for instance, that had he been properly advised he would not have pleaded guilty but rather gone to trial.[3]  See Bethel v. United States, 458 F.3d 711, 720 (7th Cir. 2006) ("To demonstrate prejudice, the defendant must show that he would not have pled guilty and would have insisted on going to trial. Whether he could have negotiated a better plea deal is irrelevant to the issue of prejudice in

---

[3]In his conclusion, petitioner "requests that his sentence be set aside and [he] be appointed counsel to revisit the plea phase and sentencing to address the issues raised herein." (Mem. in Support at 12.)

9

the ineffective assistance context.").

Petitioner claims that "there is nothing to indicate that Carlson objected to, or recommended changes to the draft [plea agreement] before Jones signed it. Carlson 'offered' it to Jones 'as is' and directed him to sign and accept it." (Mem. in Support at 10.) Even if petitioner could show prejudice based on Carlson's failure to seek a better deal, petitioner fails to explain what sort of changes Carlson should have sought and how they would have helped him. Moreover, the successful negotiation of a plea agreement involves factors beyond the control of counsel, including the cooperation of the prosecutor, who has no obligation to offer such an agreement. United States v. Hall, 212 F.3d 1016, 1022 (7th Cir. 2000). In any event, the record shows that counsel did obtain a revision of the agreement originally offered to reflect changes in the sentencing guidelines that went into effect on November 1, 2015 and which were "more beneficial" to petitioner. (R. 371 at 10:1-7.)

Finally, petitioner cannot show that his plea itself was unknowing or involuntary. As discussed above, Judge Clevert conducted an exhaustive colloquy, which more than complied with Fed. R. Crim. P. 11 and the requirements of the Constitution. Petitioner asserts, without elaboration, that "he did not fully know, understand or accept all the ramifications of his plea." (Mem. in Support at 7; see also Reply [Case No. 18-C-630, R. 14] at 1, asserting that "his guilty plea was without the requisite knowledge, intelligence and sufficient awareness of the relevant circumstances and likely consequences".) During the plea colloquy, Judge Clevert reviewed the nature of the charges, the potential penalties, the rights petitioner was giving up by pleading guilty, a number of potential collateral consequences, and the factual basis for the plea. He further confirmed that petitioner was pleading guilty because he was, in fact, guilty, that no one had threatened or forced him to plead guilty, and that he was doing so voluntarily. Petitioner

10

does not explain what more was required to make his plea knowing and voluntary.

In sum, petitioner cannot establish prejudice based on these vague allegations.

Nor can he establish deficient performance. There is no requirement that an attorney spent a particular amount of time with a defendant prior to a guilty plea, United States v. Coleman, 231 Fed. Appx. 512, 515 (7th Cir. 2007), vacated on other grounds, 552 U.S. 1138 (2008), and petitioner's contentions regarding Carlson's conduct leading up to the plea are contradicted by his own sworn statements during the plea colloquy. As indicated above, petitioner told Judge Clevert that he and Carlson had "a great relationship"; that Carlson had "explained everything"; and that Carlson had given him "good advice." Carlson told Judge Clevert that he had reviewed discovery materials with petitioner, they discussed at length how a trial might go, and they decided instead to resolve the case; petitioner agreed that he had these discussions with Carlson. Petitioner also denied feeling that his lawyer forced him to plead. As the Seventh Circuit has stated, a "motion that can succeed only if the defendant committed perjury at the plea proceedings may be rejected out of hand unless the defendant has a compelling explanation for the contradiction." United States v. Peterson, 414 F.3d 825, 827 (7th Cir. 2005). Petitioner offers no such explanation.

Petitioner's other claims are too vague to support relief. Even accepting that his relationship with Carlson may have at times been strained, the "Sixth Amendment does not guarantee a friendly and happy attorney-client relationship." United States v. Mutuc, 349 F.3d 930, 934 (7th Cir. 2003). Petitioner contends that Carlson "offered little or no tactical support" during the various stages of the case, but aside from a single issue with the indictment, which I discuss below, petitioner does not specify what more Carlson should have done. He claims that Carlson failed to investigate any flaws in the government's case without suggesting what

11

that investigation would have revealed.  See United States v. Balzano, 916 F.2d 1273, 1296 (7th Cir. 1990) ("In order to establish prejudice resulting from a failure to investigate, the defendant must make a comprehensive showing of what the investigation would have produced.") (internal quote marks omitted).

Finally, petitioner fails to explain why Carlson's recommendation that he plead guilty was unreasonable under the circumstances.  As summarized above, the government possessed substantial evidence of guilt.  During the plea colloquy, when Judge Clevert asked petitioner if he believed he was guilty, petitioner responded, "I know I'm guilty."  (R. 371 at 34:20-22.)  Even now, petitioner makes no claim of innocence.  While he does allege that Dover "coerced" him to get involved in the criminal enterprise, he admits he received stolen credit cards numbers from Dover, that he placed orders for tickets with those numbers, and that he forwarded fraudulent credit card information to others.  (Mem. in Support at 3.)  He admitted those facts and more at the plea hearing.[4]

In his reply brief, petitioner concedes that admission but asks how he could be expected to know the Rules of Evidence, especially as to admissibility and weight, and know that this evidence was sufficient to convict him; he indicates that he relied on his lawyer, who could not have spent sufficient time reviewing the discovery to provide a full assessment.  (Reply at 3.)  As indicated above, petitioner acknowledged during the plea colloquy that Carlson reviewed discovery materials with him, they discussed how the evidence related to the elements the government had to prove, and they discussed possible defenses at trial.  Petitioner claims that

---

[4] Petitioner contends that he admitted to what was in the indictment and nothing more.  (Reply at 1-2; see also Mem. in Support at 7.)  That is incorrect; as indicated above, he conceded the facts proffered by the government as a factual basis for his plea.

12

Carlson did only a "limited analysis" of the discovery before advising him to plead. (Reply at 3.) However, he fails to explain what more Carlson should have done to explain the evidence or how it would have changed his understanding of the case. In any event, a guilty plea entered by a defendant who does not see all the discovery "will still be voluntary if, as was true in this case, the plea follows disclosure of an adequate factual basis." United States v. Underwood, 174 F.3d 850, 854 (7th Cir. 1999).

### 2. Defect in the Indictment

Petitioner contends that Carlson failed to notice a possible defect in the indictment. As indicated above, count 1 charged petitioner with conspiracy to commit access device fraud, setting forth several acts in furtherance of that conspiracy, and counts 9-14 charged him with identity theft. Petitioner notes that while counts 9, 10, 11, 13, and 14 correspond to acts referenced in the conspiracy charge, count 12 does not. He alleges: "There is nothing to indicate that Carlson made any inquiry into the discovery material to support Count 12, and potentially attack the indictment." (Mem. in Support at 10.)

Petitioner does not explain what sort of attack on the indictment Carlson should have mounted. He cites no authority requiring that an identity theft charge be cross-referenced as an overt act in the conspiracy charge to which it relates. See United States v. Cieslowski, 410 F.3d 353, 360 (7th Cir. 2005) (holding that when an ineffective assistance claim is based on counsel's failure to file a pre-trial motion the defendant must prove the motion was meritorious). In any event, petitioner pleaded guilty to counts 1 and 9, with count 12 dismissed on the government's motion. Even if Carlson should have done something regarding count 12, petitioner suffered no prejudice.

13

### 3. Sentencing Advocacy

Petitioner next argues that Carlson did little to argue for any mitigation, failing to contest the government's arguments and offering only a discussion of petitioner's metamorphosis during his eight months in pre-trial detention. (Mem. in Support at 10.) Petitioner fails to explain what Carlson should have done instead. Carlson was faced with a situation in which his client participated in a wide ranging fraud and identity theft scheme, assaulted a co-defendant's brother as a warning not to cooperate, and continued to engage in similar fraud while on pre-trial release. In looking for positives to bring to Judge Clevert's attention, it was reasonable for Carlson in his remarks to focus on petitioner's post-detention efforts to better himself.

Petitioner also overlooks Carlson's 26-page sentencing submission in which Carlson, in addition to discussing petitioner's efforts to better himself by reading as Judge Clevert had suggested during the plea colloquy, noted petitioner's limited criminal history, his cooperation with the government, his family circumstances, his community service work, his plans for the future, the sentences imposed on the co-actors, and other factors. (R. 221.) In reply, petitioner contends that whatever arguments Carlson made in the sentencing memorandum were lost and little discussed at sentencing. (Reply at 4.) To the extent that Judge Clevert did not discuss on the record all of the issues raised in the memo it is hard to see how that is Carlson's fault. Nor is it necessary for a lawyer to repeat in court everything he said in a pre-hearing memorandum.

Petitioner argues that Carlson argued for a sentence of 40-48 months "without any real fervor," and petitioner was sentenced to 70 months. (Mem. in Support at 10-11.) As indicated, Judge Clevert imposed that sentence primarily because of petitioner's continued criminal

14

conduct while on bond; petitioner fails to explain how a more forceful delivery could have changed that result.

### 4. Guideline Enhancements

#### a. Loss/Restitution

Petitioner notes that, in the plea agreement, the government recommended a 14-level enhancement for loss of over $550,000 (R. 134 at 5 ¶ 17) and restitution totaling about $80,000 (R. 134 at 7-8 ¶ 30). At sentencing, Judge Clevert imposed restitution in the amount of $219,022.52. Petitioner argues the Carlson failed to investigate, verify, or contest the loss amount, and failed to reconcile the restitution ordered by the court. (Mem. in Support at 11.)

Petitioner fails to explain what an investigation into loss would have revealed or how Carlson could have challenged the resulting enhancement. As indicated above, the loss figure advanced by the government and adopted by the court appears to have been quite conservative, as it reflects fraudulent transactions from 2009 to 2012, while the scheme continued into 2014. As part of his plea, petitioner conceded that in total Dover distributed 3856 credit card account numbers, and that the financial institutions associated with those numbers reported fraud on them in the amount of $1,778,436.

As for the restitution issue, there is no requirement that loss and restitution be the same. See United States v. Kuhrt, 788 F.3d 403, 423 (5th Cir. 2015). And as the government explains in its response, the $219,022.52 figure imposed by Judge Clevert reflected the specific victims law enforcement had been able to identify as actually suffering the losses on the subject transactions; for other transactions, it was difficult to determine who actually absorbed the loss, the credit card company or the venue. It thus appears that, if anything, petitioner received a

15

benefit in the form of a lower restitution order due to these accounting difficulties. Petitioner contends that Carlson should have independently verified the calculations and reconciled the difference between the loss and the restitution (Reply at 6), but he does not explain what such an effort would have achieved or how it would have changed the outcome.

### b. Role in the Offense

Petitioner notes that the government also recommended a 4-level enhancement as an organizer or leader. He contends that it is undisputed that Dover occupied the top spot in this conspiracy, and he was just one of many subordinates to whom she provided fraudulent credit card information; yet Carlson did not object to, or attempt to mitigate, his role in the conspiracy. (Mem. in Support at 11.)

"There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1 cmt. n.4. Accordingly, Dover's position would not prevent the imposition of an enhancement on petitioner,[5] and petitioner fails to explain how Carlson could have challenged the increase, given petitioner's admission that he directed others in picking up and selling tickets, claiming half of the proceeds for himself.

Finally, regarding both of petitioner's guideline issues, I note that at the sentencing hearing petitioner admitted that he had reviewed the PSR with Carlson, and that he had no additional matters he needed to bring to his lawyer's attention or discuss with his lawyer before proceeding with sentencing. Carlson then indicated that "we agree" with the guidelines

---

[5]In reply, petitioner asserts that Dover caused a greater total loss than he did, but he fails to explain why this means he could not receive an enhancement for his role. He also notes that the government relied in part on the self-serving statements of cooperators regarding his role, but he does not explain what Carlson could have done to impeach those cooperators and he makes no showing that their statements were false. (Reply at 5-6.) Nor does he address his own admission during the plea colloquy that others worked for him selling tickets.

16

contained in the PSR.

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that petitioner's motion (Case No. 18-C-630, R. 1) is denied, and this case is dismissed. The Clerk is directed to enter judgment accordingly.

Pursuant to Rule 11(a) of the Rules Governing Section 2255 Proceedings, the district court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2255 petitioner. In order to obtain a COA, the petitioner must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard for making a "substantial showing" is whether reasonable jurists could debate whether the motion should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further. Slack v. McDaniel, 529 U.S. 473, 484 (2000). For the reasons stated above, petitioner cannot make such a showing, so I decline to issue a COA.

**IT IS FURTHER ORDERED** that petitioner's motion for bail pending the court's decision in his § 2255 action (Case No. 14-CR-196, R. 370) is denied. Because the § 2255 motion has no merit, there is no basis for granting release on bond.

Dated at Milwaukee, Wisconsin, this 3rd day of August, 2018.

/s Lynn Adelman
LYNN ADELMAN
District Judge